## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**ANNIE D. SARTIN**                            **CIVIL ACTION**

**VERSUS**                                     **NO. 15-4834-JTM-SS**

**CAROLYN COLVIN, ACTING**
**COMMISSIONER OF SOCIAL SECURITY**

## REPORT AND RECOMMENDATION

The plaintiff, Annie D. Sartin ("Ms. Sartin"), seeks judicial review, pursuant to Section 405(g) of the Social Security Act (the "Act"), of the final decision of the Commissioner of the Social Security Administration (the "Commissioner") denying her claims for disability insurance benefits and a period of disability under Title II of the Act, 42 U.S.C. § 423, and supplemental security income ("SSI") under Title XVI of the Social Security Act ("Act"), 42 U.S.C. § 1381.

## PROCEDURAL HISTORY

On June 16, 2014, Ms. Sartin submitted applications for benefits alleging that she became disabled on February 8, 2004.  R. 148-157.  Ms. Sartin identified her disabling conditions as: depression; sleep problems; ADHD; bipolar; mood disorder; anxiety; panic attacks; and shortness of breath.  R. 183.  On September 16, 2014, the Commissioner denied Ms. Sartin's claims for benefits.  R. 100-103.

There was hearing before an Administrative Law Judge ("ALJ") on May 21, 2015.  Ms. Sartin was represented by counsel at the hearing.  R. 32.  On July 1, 2015, the ALJ issued an unfavorable decision.  R. 27.  On August 27, 2015, the Appeals Council denied the request for review.  R. 1-3.

On September 28, 2015, Ms. Sartin filed a complaint in federal court for review of the Commissioner's decision.  Rec. doc. 1.  The Commissioner answered and filed the administrative record.  Rec. docs. 9 and 10.

Ms. Sartin filed a motion for summary judgment.  Rec. doc. 16.  The Commissioner filed a cross-motion for summary judgment.  Rec. doc. 20.  A "legal representative" appeared on the filings with Ms. Sartin in federal court.  Rec. doc. 1 at 3.

## STATEMENT OF ISSUES ON APPEAL

**Issue No. 1**.     Does Ms. Sartin's motion for summary judgment meet the minimal requirements?

**Issue No. 2**.     Did the ALJ properly consider the opinion of a non-examining medical consultant?

**Issue No. 3.**     Whether there is substantial evidence in the record to support the final decision of the Commissioner as trier of fact and whether the Commissioner applied the appropriate legal standard in evaluating the evidence?

**Issue No. 4**.     Is the additional medical evidence material?

## THE COMMISSIONER'S FINDINGS

The ALJ made the following findings:

1.  Ms. Sartin met the insured status requirements of the Act through March 31, 2019.

2.  Ms. Sartin has not engaged in substantial gainful activity since October 1, 2014, the amended alleged onset date (20 CFR 404.1571 *et seq*., and 416.971 *et seq*.)

3.  Ms. Sartin has the following severe impairments:  cervical spondylosis at the C5-6 level; bipolar disorder; depression; and generalized anxiety disorder (20 CFR 401.1520(c) and 416.920(c)).

4.  Ms. Sartin does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.  Ms. Sartin had the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c) except with non-exertional mental ability to perform simple, routine tasks; occasionally interacting with supervisors, the public, and coworkers; and no frequent changes in the work setting.

6.  Ms. Sartin is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.  Ms. Sartin was born in 1979 and was 35 years old at the time of the hearing, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.  Ms. Sartin has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that Ms. Sartin is "not disabled," whether or not she has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.  Considering Ms. Sartin's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that Ms. Sartin can perform (20 CFR 404.1569, 404.1569(a), 416,969, and 416.969(a)).

11.  Ms. Sartin has not been under a disability, as defined by the Act, from October 1, 2014, through the date of the decision, July 1, 2015 (20 CFR 404.1520(g) and 416.920(g)).

## <u>ANALYSIS</u>

a.      **<u>Standard of Review.</u>**

The function of this court on judicial review is limited to determining whether there is substantial evidence in the record to support the final decision of the Commissioner as trier of fact

and whether the Commissioner applied the appropriate legal standards in evaluating the evidence. Perez v. Barnhart, 415 F.3d 457, 461 (5th Cir. 2005). Substantial evidence is more than a scintilla but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427 (1971). Alternatively, substantial evidence may be described as that quantum of relevant evidence that a reasonable mind might accept as adequate to support a conclusion. Carey v. Apfel, 230 F.3d 131, 135 (5th Cir. 2000). This court may not re-weigh the evidence, try the issues *de novo* or substitute its judgment for the Commissioner's. Perez, 415 F.3d at 461.

The administrative law judge is entitled to make any finding that is supported by substantial evidence, regardless of whether other conclusions are also permissible. See Arkansas v. Oklahoma, 503 U.S. 91, 113, 112 S.Ct. 1046, 1060 (1992). Despite this court's limited function, it must scrutinize the record in its entirety to determine the reasonableness of the decision reached and whether substantial evidence exists to support it. Johnson v. Bowen, 864 F.2d 340, 343-44 (5th Cir. 1988). Any findings of fact by the Commissioner that are supported by substantial evidence are conclusive. Ripley v. Chater, 67 F.3d 552, 555 (5th Cir. 1995).

b.    **Testimony at the Hearing**.

The onset date of the alleged disability was amended to October 1, 2014. R. 36.

Ms. Sartin's attorney reported that she attempted employment at McDonald's and Dollar Tree, but due to her impairments she was unable to maintain the jobs. She sought more accommodating employment as a baby sitter. R. 36. Ms. Sartin was diagnosed with anxiety disorder, depressive disorder and bipolar disorder. There were mental status examinations revealing problems with concentration, energy and focus. R. 36. Her appetite was poor. Her mood was agitated and irritable. R. 36. Even with medication, she would be an unreliable

4

employee.  R. 37.  She experienced post-traumatic stress syndrome as a result of an incident at Dollar Tree.  R. 37.  Her attorney contended that Ms. Sartin was disabled because she had marked impairments in the ability to sustain consistent concentration and pace as well as every day activities.  R. 38.

Ms. Sartin testified that she was 35.  R. 39.  She lived in Bogalusa in a house with her two children, who were 15 and 13.  R. 39-40.  Her children attended school.  R. 55.  They took the bus to school.  R. 55.  Her son participated in athletics.  When he played football and basketball, she went to see him.  R. 56-57.  Watching him play sports was a priority.  R. 58.

Ms. Sartin had a driver's license.  R. 55.  She was able to drive.  R. 55.  She could leave the house alone.  R. 55-56.  Her only income was from her son's disability.  R. 64.

In 2008-2009, she worked for Citi-Trends as a cashier for about six months.  R. 65.  She also was self-employed selling candy and hot dogs.  R. 65-66.  She worked as a cashier for Wal-Mart from November 2011 to March 2013 when she was in New York.  R. 67.  She worked part-time and went to school.  R. 68.

In 2013 and 2014, she earned about $14,000 a year.  She worked at Dollar Tree in 2013 and McDonald's in 2014 and did babysitting.  R. 43-44.  She was fired by Dollar Tree for violating the company policy against theft.  R. 45.  She left McDonald's because there was too much stress. She suffered from anxiety and panic attacks.  R. 46.  She was not on medication at that time.  R. 46.

Ms. Sartin's last employment was in October 2014 as a baby sitter for a family.  R. 43. They had moved into town, but were no longer in town.  R. 52.  She babysat about four days a week from 8:00 a.m. to 5:00 p.m. for children who were three, five and six years old.  R. 44.  She never called the family to report she could not make it for babysitting.  R. 49.  She tried to watch

TV with the children.  She took them for rides and to parks to get them out of the house.  R. 63.  She stopped babysitting to deal with things in her life and because she was overwhelmed.  R. 49.

Ms. Sartin attended college at Northshore Technical College in Bogalusa for one or two semesters in 2014.  R. 40-41.  She was a full-time student taking 12 hours of credit.  R. 41.  There were classes Monday through Friday.  R. 41.  She received a 4.0 in July 2014.  R. 42.  She was able to this because of support by a teacher who encouraged her.  At times she wanted to throw in the towel.  R. 42.  She did not miss class or leave class early.  R. 42-43.  She did not enroll in 2015 because of problems in her personal life and inability to deal with people.  R. 41.

Ms. Sartin had panic attacks when she was stressed about something or when she thought about something negative.  R. 47.  She did not know how long they lasted.  Sometimes they got so bad she went to the emergency room.  R. 47.  The last ER visit for a panic attack was in 2015 at the Bogalusa medical center.  R. 47.  Medication and therapy helped with her anxiety and panic attacks.  R. 46-48.  Because of the medication, she experienced drowsiness.  R. 48.  With the medication she did not have difficulty sleeping.  R. 48.  She did not have problems making the appointments with her doctors or taking her medication.  R. 56.

Ms. Sartin experienced outbursts of anger.  R. 49.  For example a few weeks before the hearing, a young lady approached her on social media and "cussed her out."  She got in her truck.  She was so angry that she wanted to cut her neck.  R. 50.

Ms. Sartin has problems with concentration and comprehension.  R. 50.  Even when she got A's she found it frustrating trying to study.  R. 51.  Sometimes her tests were open book.  R. 51.  She did not watch much TV.  R. 60.  She had trouble concentrating on programs.  R. 60.  She had trouble comprehending books.  R. 60.

Ms. Sartin did not spend time with friends and family.  It was just her and her children.  R. 51.  She got up in the morning.  Sometimes she washed dishes or clothes and cooked.  If she did not feel like dressing, she just threw something on.  R. 53-54.  She cooked for her children.  R. 54. Sometimes they fed themselves.  R. 54-55.  When her children were in school, she tried to exercise by walking.  R. 60.  Sometimes she was depressed.  She did not want to do anything, including bathing.  R. 53.  She would like to do simple things like going out with her family and eating, but it was hard.  R. 59.  She used Google and Facebook about twice a week to see what friends were doing.  Very rarely did she correspond with them.  R. 59.

On her bad days she thought about things that stressed her and she wanted to give up and die.  On some of these days she pulled herself up or she talked to her therapist, who helped her. R. 61.  About half of the days in a month were bad days.  R. 61-62.

She did her grocery shopping.  Sometimes she would have a flashback and leave the store before checking out.  R. 64.  This happened the week before the hearing.  R. 64.

With the first hypothetical provided by the ALJ, the vocational expert testified that there were positions that she could perform.  R. 70.

**c.**     **Medical Evidence**.

2013

On August 27, 2013, Ms. Sartin sought treatment at the emergency room at Bogalusa Medical Center ("BMC") for complaints of pain in her right ear and a headache.  The physical exam was unremarkable. R. 468-70.  The diagnosis was right ear infection.  She was treated with Keflex.  R. 474.  On August 31, 2013, she returned to BMC and reported vaginal itching.  R. 460-65.  The diagnosis was vaginal candidiasis.  Medication was prescribed.  R. 465.  On September 10, 2013, she returned to BMC with a complaint of vaginal discharge.  R. 413-14.  On October 5,

2013, she returned to BMC ER with the same symptoms.  R. 448-453 and 459.  Medication was prescribed.  R. 453.  She also complained of back pain.  X-rays revealed only mild scoliosis.  No abnormalities were identified.  R. 446-47.  On October 22, 2013, she returned to BMC with reports of pain in the abdomen, pelvis and low back.  R. 433-38.  On November 18, 2013, she returned to BMC with complaints of pain radiating from low back to her vagina.  Medication was prescribed. R. 390-91 and 424.

2014

On April 3, 2014, Ms. Sartin was seen by Leslie Fitzmorris, LCSW, on a referral from BMC for severe anxiety and panic attacks.  The diagnosis was anxiety disorder, episodic mood disorders and generalized anxiety disorder.  R. 354-56.  On April 9, 2014, she returned to Ms. Fitzmorris.  She reported that she was terminated from her part-time job.  R. 352-353.

On April 15, 2014, Ms. Sartin was seen by Bruce C. Samuels, M.D., an internist (R. 350). R. 274-80.  She reported shortness of breath, back stiffness and anxiety.  She did not report depression or sleep disturbances.  R. 274.  Her general appearance was recorded as alert; orientated to time, place and person; well developed and nourished; and groomed.  She was not in acute distress.  The examination of her ears was normal.  There was tenderness on palpation on the examination of her back.  There was no muscle spasm.  R. 275.  Her mood was not depressed. Xanax was prescribed.  She was to return in three months.  R. 276.  The impression of an x-ray of the thyroid was thyromegay with bilateral thyroid nodules consistent with multinodular goiter.  R. 278.  An echocardiogram did not reveal any non-trivial impressions.  R. 279.  There was normal bone density as determined by a bone density report.  R. 280.

On April 16, 2014, Ms. Sartin returned to Ms. Fitzmorris, who confirmed that Dr. Samuels was an internist and not a psychiatrist.  Ms. Sartin reported that she was not calm enough on Xanax.

She wanted to see a psychiatrist. She described panic attacks. She had a job interview at McDonald's. She was given a referral to Dr. Green, a psychiatrist. R. 350-51.

On April 23, 2014, Ms. Sartin was seen by Armand Rigaux, M.D. to talk about anemia, anxiety and blood pressure. The assessment was anxiety and essential hypertension. There was a normal examination. R. 346. On that same day, she was seen by Ms. Fitzmorris. She reported that she was getting more and more depressed. R. 348-49. On April 24, 2014, she returned to Dr. Rigaux for lab work. R. 344-35.

On April 24, 2014, Ms. Sartin was seen by Renee C. W---, a mental health practitioner. R. 289-298, 485, 537-543. She also was seen by J --- Coleman, Ph.D., of Louisiana Support Services. 299-303. She was on Risperdal, Lamictal, Klonipin, Prozac, Depakote and Vistrail. R. 485. She reported feeling very depressed and overwhelmed; she had no energy; and she suffered from insomnia. R. 299. She was plagued with panic attacks and anxiety. She reported that she had been physically, emotionally, verbally and sexually abused for most of her life. R. 299. She was interested in attending college and pursuing a degree in social work. R. 300. The notes described her current status as overactive; hesitant and pressured speech; an elevated and anxious mood; depressed affect; loose associations, phobias and fears; impaired concentration; oriented to person, place and time; normal recent memory; impaired immediate recall; and borderline intellectual functioning. R. 302. The diagnosis was anxiety disorder, depression disorder and bi-polar disorder. Management of her medication and individual therapy were described as the plan of care with education services and self-help groups. R. 302.

On April 30, 2014, Ms. Sartin returned to Ms. Fitzmorris. The prognosis was good. R. 342-43. She was seen by Ms. Fitzmorris on May 7, 2014. She reported poor concentration and

anxiety.  The plan was to continue with counseling to target anxiety, depression and coping skills.  R. 340.  Ms. Fitzmorris saw her on May 14, 2014.  The prognosis was good.  R. 337-39.

On May 20, 2014, there was an X-ray report on Ms. Sartin's thoracic spine.  There were no significant degenerative changes.  The impression was no acute abnormality.  R. 426.  The results from an x-ray of the lumbar spine was the same with the additional note of a degree of scoliosis.  R. 427.  The cervical x-ray showed a loss of height with spondylosis at C5/6.  R. 428.  The impression on a chest x-ray was no acute cardiopulmonary disease.  R. 429.

On May 21, 2014, Ms. Sartin returned to Ms. Fitzmorris.  She reported improvement in regulating her emotions, but she continued to report depressed mood, anxiety, isolation, poor sleep and poor concentration.  Her progress was slow with some improvement.  The prognosis was good.  R. 335-36.  On May 23, 2014, she was seen by Pamela DuPont, a mental health nurse practitioner.  She complained that her medication was not working.  Her depression was worse.  She could not sleep.  Her medication was changed.  R. 307-10.  On May 28, 2014, she was seen by Ms. Fitzmorris.  R. 333-34.

On June 2, 2014, Sartin was seen by Dr. Rigaux for complaint of low back pain and headache.  R. 329-30.  There was lab work.  R. 331-32.  On June 4, 2014, she returned to Ms. Fitzmorris.  She was encouraged to establish and maintain a medicine management service.  She was attending school four days a week.  R. 326-28.  On June 11, 2014, she returned to Ms. Fitzmorris.  She attended school that day, but complained of poor concentration.  R. 323-25.  On June 20, 2014, she was seen by Helena Richard, a family psychiatric mental health nurse practitioner.  She had started on new medications.  She stopped taking them because of reactions.  She was afraid they were causing depression.  She was attending school.  She was to return in four

10

weeks.  R. 306.  On June 25, 2014, she reported to Ms. Fitzmorris that she was taking Seroquel, Zoloft and Xanax.  The progress was fair with the prognosis was good.  R. 320-22.

On June 28, 2014, Ms. Sartin was seen at the emergency room of Our Lady of the Angels Hospital.  She reported low back pain and headache.  R. 419-25.  On July 3, 2014, she was seen by Ms. Fitzmorris.  She reported agitation and moodiness.  She felt positively about her school work.  R. 318-19.  On July 11, 2014, she was seen by Ms. Fitzmorris.  She was better able to concentrate and think clearly.  She was excelling at school.  Her progress was fair.  Her condition was good.  R. 316-17.  On July 17, 2014, she returned to Ms. Fitzmorris.  She reported angry outbursts in the previous week. R. 314-15.  On July 18, 2014, she was seen by Nurse Practitioner Richard.  She reported that she was very depressed.  Her medication was adjusted.  R. 305, 308 and 376.  On July 23, 2014, she was seen by Ms. Fitzmorris.  R. 311-13.

On August 13, 2014, Ms. Sartin was seen for an annual exam.  No complaints were voiced. R. 416-17.  On August 18, 2014, she was told to continue with her supporting therapy.  She was continued on Lexapro and Xanax.  R. 363.  On August 18, 2014, she was seen by Nurse Practitioner Richard with Louisiana Support Services.  She reported a much improved mood.  R. 487.

On September 12, 2014, Ms. Sartin was seen at the Phelps Clinic.  She reported anxiety, back pain and neck pain. R. 411-12.  On September 24, 2014, Nurse Practitioner Stacey Sutton reported that Ms. Sartin was under her care.  She suffered from severe depression and had a history of anxiety. R. 359.

On October 3, 2014, Ms. Sartin was seen by Troy Beaucoudray, M.D., at Advanced Neurodiagnostic Center with complaints of low back pain and neck pain.  On the mental status exam, her affect, speech, thought content, perception and cognitive function were all normal.  Her muscle strength was normal at 5/5 in all muscles.  Her reflexes were normal.  She was to be sent

11

to a toxicology screen to ensure medication compliance.  While it was noted that she had tenderness in the cervical and lumbar region mainly due to muscle spasm, no additional diagnostic testing was warranted given the lack of radicular symptomatology.  She was to do home stretching and strengthening exercises.  She was started on Narco 5-325MG.  R. 481-82 and 503-06.

On October 8, 2014, she complained of infection in her left ear.  R. 409-10.  On October 24, 2014, she was seen by Nurse Practitioner Richard.  She reported that she continued to have problems, but was better.  R. 362.

On November 5, 2014, Ms. Sartin was seen by Stacy L. Fernandez-Rodrigue, M.D., a specialist in emergency room medicine, at the Angels Hospital ER for panic attacks and asthma. R. 399-405 and 407.  The condition started about four days before when she was using an inhaler. R. 400.  She reported chest pain.  R. 401.  Her medication was changed.  R. 402.  No acute disease was seen on a chest x-ray.  On November 12, 2014, she was seen as an outpatient for review of her lab work from the ER visit.  R. 394-95.  On November 26, 2014, she returned to the Advanced Neurodiagnostic Center, where she was seen by a nurse practitioner.  She reported relief from the neck and back pain with the medication.  The physical exam was normal.  R. 479-80.  On November 21, 2014, she was seen by Nurse Practitioner Richard.  Her mood was stable.  She was described as calm.  R. 361.

A December 3, 2014 pulmonary function report from Angels Hospital was normal except for a mild decrease in diffusing capacity.  This was interpreted as an insignificant response to bronchodilator.  R. 430-31.  A pulmonary function report, dated December 10, 2014, was similar. R. 432.  On December 12, 2014, Ms. Sartin was seen at Phelps clinic for a follow-up on the pulmonary function test results.  She reported no panic attacks in the two preceding weeks.  She was doing well.  R. 388-89.  On December 16, 2014, she was seen by Nurse Practitioner Richard.

Her medication was changed.  R. 369.  A residual functional capacity questionnaire was completed.  Richard reported that Ms. Sartin was not capable of working 8 hours a day, 5 days a week.  R. 489-91.  A mental capacity assessment was completed with findings by Richard of "marked" limitations in understanding and memory, sustained concentration and persistence, social interaction, and adaptation and one "extreme" limitation in social interaction.  R. 492-95.  On December 30, 2014, Ms. Sartin returned to the ER at Angels Hospital – family medicine.  She reported pain in her back and abdomen and pressure upon urinating.  R. 379-81 and 384-85.

2015

On January 23, 2015, Ms. Sartin was a walk-in at a clinic.  She complained of low back pain.  She wanted to be tested for HIV.  R. 584-85.  The HIV test was non-reactive.  R. 586.  Other tests were negative.  R. 587.  She received physical therapy at Angels Hospital on January 27 and 29, 2015.  On February 27, 2015, a physical therapist at Angels Hospital noted that she was seen twice but she did not return for a follow-up appointment.  Her current status was unknown.  R. 578-83.  On January 28, 2015, Nurse Practitioner Richard reported that she was not taking her medication properly.  R. 513.

On February 5, 2015, Ms. Sartin was seen by Dr. Samuels to discuss test results.  The review of systems reported back stiffness, but no muscle aches, no arthralgias, no soft tissue swelling, no localized joint swelling and no localized joint stiffness.  The physical examination of the back found tenderness on palpation, but no muscle spasm or costovertebral angle tenderness.  The neurological examination found her oriented to time, place and person.  The cranial nerves were normal.  No sensory abnormalities were noted.  The motor exam demonstrated no dysfunction.  Reflexes were normal.  Her mood was not depressed.  There were no paranoid ideations or delusions.  She was taking Seroquel.  R. 553-54.

On March 10, 2015, Ms. Sartin went to the Angels Hospital ER.  There was a urine pregnancy test.  She reported a cough and tightness in her chest.  R. 564-70.  A chest x-ray did not reveal any interval lobar consolidation or cardiac decompensation.  R. 577.

On April 1, 2015, Ms. Sartin was seen by Dr. Samuels to refill her Norco prescription.  The findings on the review of systems, the physical, neurologic and psychiatric examinations were the same as reported on February 5, 2015.  R. 549-552.

On May 6, 2015, Ms. Sartin returned to Dr. Samuels.  She reported knee pain and headaches.  She wanted an HIV test.  Dr. Samuels noted that she was there mainly for medication and nerve pills.  He explained that he could no longer prescribe the medication for her as she was obtaining them from at least four other doctors.  While anxiety was noted, there was no note of depression or sleep disturbance.  The findings on the review of systems, the physical, neurologic and psychiatric examinations were the same as reported on February 5, 2015.  R. 546-48.

c.      **Plaintiff's Appeal**.

**Issue No. 1**.      Does Ms. Sartin's motion for summary judgment meet the minimal requirements?

The Commissioner argues that Ms. Sartin's motion for summary judgment was inadequately briefed.  Her motion states:

> I, the Plaintiff, charge that the Social Security Administration has discriminated against me, by not properly reviewing all evidence.  I've suffered these mental problems throughout my lifetime, totally unaware, wondering what was wrong.  Mentally, I can't keep up!  Physically, I suffer from severe back and neck pain, which all of the above I am being treated for and my activity is still limited.  The medicine does help, but they further contribute to my non ability to work.

Rec. doc. 16 at 2.  She adds that a non-examining state medical consultant provided an opinion on her mental disabilities and she would like to introduce the evidence attached to her motion.  She presents nothing else in support of her motion.  Rec. doc. 16.

14

> Though we review the briefs of *pro se* appellants with some relaxation of the usual demands on counseled parties, we do not abandon the insistence that some minimal legal basis for arguments must be offered.  Even a *pro se* appellant must set forth the reasons he deserves relief with citation to the authorities, statutes and parts of the record relied on.

Cornett v. Astrue, 261 F. App'x 644, 651 (5th Cir. 2008) (citations and quotation marks omitted).

Ms. Sartin's motion does not meet the requirements of the Court's scheduling order (Rec. docs. 5 and 15) or the minimal standard for *pro se* litigants described in Cornett.

Notwithstanding the inadequacies of Ms. Sartin's motion for summary judgment, it will be considered.

**Issue No. 2**.    Did the ALJ properly consider the opinion of a non-examining medical consultant?

Ms. Sartin's motion states:

> [A]ccording to the Social Security Administration records on my opinions on my mental disabilities, was given by a non-examining state medical consultant (Ref. Doc. 10-2).

Rec. doc. 16 at 1.

A disability determination explanation was issued on September 16, 2014.  R. 74-86.  It reported that a consultative examination was not required.  R. 78.  A non-examining psychological consultant, Cheryl Marsiglia, Ph.D., completed findings of fact and analysis of evidence and a mental residual functional capacity ("RFC") assessment.  R. 78-80 and 82-84.  For example, in the review of the listing criteria, Dr. Marsiglia found Ms. Sartin's difficulties in maintaining social functioning to be moderate.  R. 79.  On the mental RFC assessment, her ability to make simple-work related decisions was not significantly limited.  R. 83.

Pursuant to the regulations, all evidence from non-examining sources are considered to be opinion evidence.  Subject to the rules described in the regulations, the Commissioner considers the opinions of non-examining sources.  20 C.F.R. § 404.1527; and SSR 96-6p, 1996 WL 374180 (S.S.A.).  The ALJ considered the opinions of Dr. Marsiglia.  Based on his analysis of the medical

evidence, he gave it great weight.  He found that while Ms. Sartin had certain mental functional

limitations, she retained the ability to perform simple, routine work.  R. 25-26.  The ALJ properly

considered the opinion of Dr. Marsiglia, the non-examining medical consultant.

**Issue No. 3.**     Whether there is substantial evidence in the record to support the final decision of
the Commissioner as trier of fact and whether the Commissioner applied the
appropriate legal standard in evaluating the evidence?

      1.   <u>Substantial Evidence for Finding on Physical Impairment</u>.

The ALJ found that Ms. Sartin's severe impairments included cervical spondylosis at C5-

6.  He concluded that it, either individually or in combination with her other impairments, did not

meet any of the listed impairments.  He found she had the residual functional capacity to perform

medium work.

When Ms. Sartin went to the ER on August 27, 2013, the physical exam was unremarkable.

R. 468-70.  October 2013 x-rays revealed only mild scoliosis.  No abnormalities were noted.  R.

446-47.  A year later, on October 3, 2014, she was seen by Dr. Beaucoudray with complaints of

low back pain and neck pain.  Her muscle strength was normal at 5/5 in all muscles.  Her reflexes

were normal.  While it was noted that she had tenderness in the cervical and lumbar region mainly

due to muscle spasm, no additional diagnostic testing was warranted given the lack of radicular

symptomatology.  She was to do home stretching and strengthening exercises.  R. 481-82.  In

February 27, 2015, a physical therapist noted that she did not return for a follow-up appointment.

R. 578-83.

Ms. Sartin was seen by Dr. Samuels on February 5, April 1 and May 6, 2015.  On each

occasion the review of systems reported back stiffness, but no muscle aches, arthralgias, soft tissue

swelling, localized joint swelling or localized joint stiffness.  The physical examination of the back

found tenderness on palpation, but no muscle spasm or costovertebral angle tenderness.  The

cranial nerves were normal.  No sensory abnormalities were noted.  The motor exam demonstrated no dysfunction.  Reflexes were normal.  R. 546-54.

    2.  <u>Substantial Evidence for Finding on Mental Impairments</u>.

The ALJ also found that Ms. Sartin had the following severe impairments:  bipolar disorder; depression; and generalized anxiety disorder.  Rec. doc. 12.  However, he found they did not meet the listing requirements individually or in combination.  Rec. doc. 15.  The ALJ found that these impairments did not preclude the finding that she could perform medium work "except with the non-exertional mental ability to perform simple, routine tasks; occasionally interact with supervisors, the public, and coworkers; and no frequent changes in the work setting."  R. 18.

In April 2014, Ms. Sartin began reporting anxiety and depressed mood.  She was seen frequently by several practitioners.  On April 3, 2014, she was seen by Leslie Fitzmorris, LCSW, who diagnosed her with generalized anxiety and episodic mood disorders.  R. 354-56.  On April 15, 2014, she reported anxiety to Dr. Samuels, an internist.  R. 274-80.  She did not report depression or sleep disturbances.  R. 274.  She was not in acute distress.  R. 275.  Xanax was prescribed.  R. 276.  On April 16, 2014, she reported to Ms. Fitzmorris that she was not calm enough on Xanax.  She described panic attacks.  She was referred to a psychiatrist.  R. 350-51.

On April 23, 2014, Ms. Sartin was seen by Dr. Rigaux.  The assessment included anxiety. R. 346.  On that same day, she reported to Ms. Fitzmorris that she was getting more and more depressed.  R. 348-49.  On April 24, 2014, she was seen by a mental health practitioner and psychologist.  R. 289-303, 485, 537-543.  She reported feeling very depressed and overwhelmed; she had no energy; and she suffered from insomnia.  R. 299.  She was plagued with panic attacks and anxiety.  R. 299.  The diagnosis was anxiety disorder, depression disorder and bi-polar disorder.  R. 302.  On April 30, 2014, her prognosis was good.  R. 342-43.

On May 7, 2014, she reported poor concentration and anxiety.  R. 340.  On May 14, 2014, her prognosis was good.  R. 337-39.  On May 21, 2014, Ms. Sartin reported improvement in regulating her emotions.  She continued to experience depressed mood, anxiety, isolation, poor sleep and poor concentration.  Her progress was slow with some improvement.  The prognosis was good.  R. 335-36.  On May 23, 2014, she was seen by Pamela DuPont, a mental health nurse practitioner.  Her depression was worse.  She could not sleep.  She complained that her medication was not working.  It was changed.  R. 307-10.

On June 4, 2016, Ms. Fitzmorris encouraged Ms. Sartin to establish and maintain a medicine management service.  She was attending school four days a week.  R. 326-28.  On June 11, 2016, she complained to Ms. Fitzmorris of poor concentration.  R. 323-25.  On June 20, 2014, she was seen by a mental health nurse practitioner.  She was afraid her medications were causing depression.  R. 306.  On June 25, 2015, she reported to Ms. Fitzmorris that she was taking Seroquel, Zoloft and Xanax.  Her progress was fair.  The prognosis was good.  R. 320-22.

On July 3, 2014, Ms. Sartin reported agitation and moodiness to Ms. Fitzmorris.  She felt positive about her school work.  R. 318-19.  On July 11, 2014, she was better able to concentrate and think clearly.  She was excelling at school.  Ms. Fitzmorris described her progress as fair and her condition good.  R. 316-17.  On July 17, 2014, she reported angry outbursts in the previous week. R. 314-15.  On July 18, 2014, she was very depressed.  Her medication was adjusted.  R. 305, 308 and 376.

On August 18, 2014, she was told to continue with her support therapy.  She was on Lexapro and Xanax.  R. 363.  On August 18, 2014, she was seen by Nurse Practitioner Richard.  She reported a much improved mood.  R. 487.

On September 12, 2014, Ms. Sartin reported anxiety, back pain and neck pain. R. 411-12. On September 24, 2014, Nurse Practitioner Sutton reported that Ms. Sartin suffered from severe depression and had a history of anxiety.  R. 359.  On October 24, 2014, she reported to Nurse Practitioner Richard that, while she continued to have problems, she was better.  R. 362.

On November 5, 2014, Ms. Sartin was seen at the Angels Hospital ER for panic attacks and asthma. R. 399-405 and 407.  On November 21, 2014, Nurse Practitioner Richard described Ms. Sartin as calm with a stable mood.  R. 361.  On December 12, 2014, Ms. Sartin reported no panic attacks in the two preceding weeks.  She was doing well.  R. 388-89.

On December 16, 2014, Nurse Practitioner Richard completed a residual functional capacity questionnaire.  She reported that Ms. Sartin was not capable of working 8 hours a day, 5 days a week.  R. 489-91.  A mental capacity assessment was completed.  R. 492-95.  The ALJ gave Ms. Richard's mental functional assessment little weight because:  (1) Ms. Sartin was able to work for several months as a baby sitter for three young children even with her alleged symptoms; (2) her other activities, for example, driving and attending school functions; and (3) her improvement by the time of the May 21, 2015 hearing.  R. 24-25.

In 2015, Ms. Sartin sought treatment much less frequently than in April 2014 and the following months.  On January 28, 2015, Nurse Practitioner Richard reported that she was not taking her medication properly.  R. 513.  On February 5 and April 1, 2015, Dr. Samuels noted that Ms. Sartin's mood was not depressed.  There were no paranoid ideations or delusions.  R. 553-54. On May 6, 2015, Ms. Sartin returned to Dr. Samuels for medication.  While anxiety was noted, there was no note of depression or sleep disturbance.  R. 546-48.

In 2014, when she reported symptoms of anxiety, panic attacks and depressed mood, she worked at McDonald's and did babysitting.  R. 43-44.  She reported leaving McDonald's because

there was too much stress.  R. 46.  Her last employment was in October 2014 as a baby sitter.  R. 43.  During 2014, she attended college as a full-time student taking 12 hours of credit.  R. 40-41.  She received a 4.0 in July 2014.  From April through July 2014 she sought frequent treatment from Ms. Fitzmorris and other mental health providers.  She reported that medication and therapy helped with her anxiety and panic attacks.  R. 46-48.

The ALJ considered whether Ms. Sartin satisfied the listing requirements for affective disorders and anxiety related disorders.  20 C.F.R. Part 04, Subpart P, Appendix 1-12.04 and 12.06.  He found that she did not meet the paragraph B criteria because:  (1) in the activities of daily living, she had only a mild restriction; (2) in social function, she had moderate difficulties; (3) with regard to concentration, persistence or pace, she had moderate difficulties; and (4) she experienced no episodes of decompensation which had been of extended duration.  Her limitations did not cause at least two marked limitations or one marked limitation with repeated episodes of decompensation.  The ALJ also found that Ms. Sartin did not meet the paragraph C criteria.  R. 16-18.  The ALJ determined that Ms. Sartin's statements concerning the intensity, persistence and limiting effects of her alleged symptoms were not entirely credible.  For example, while she reported difficulty focusing, inability to function and panic attacks, she was able to attend college fulltime in 2014, earn a 4.0 average, and work as a baby sitter for three young children through October 2014.

There is substantial evidence in the record to support the ALJ's decision and he applied the appropriate legal standard in evaluating the evidence.

**Issue No. 4**.    Is the additional medical evidence material?

The final issue is the additional medical evidence presented by Ms. Sartin with her motion for summary judgment.  Rec. doc. 16 (Exhibit).  It is dated after the ALJ's decision of July 1, 2015.

The additional medical evidence begins with a report of a September 24, 2015 visit to Angels Hospital in the Med Management Physician Services. The record appears incomplete as there is only one page. She reported that she was well so far. The Seroquel calmed her but made her tired. She was doing odd jobs. Id.

On November 5, 2015, Ms. Sartin returned to Angels Hospital in the Med Management Physician Services. She reported Zoloft seemed pretty decent. It helped keep her calm and helped with the depression. The diagnosis was unspecified bipolar disorder. Xanax, Seroquel and Zoloft were prescribed. It was noted that she saw Ms. Fitzmorris for therapy. Id.

On February 5, 2016, Ms. Sartin was seen at Angels Hospital in the Med Management Physician Services by Christopher Fritzsche, M.D. Id.

In Castillo v. Barnhard, 325 F.3d 550 (5th Cir. 2003), the Fifth Circuit stated that, "[n]ew evidence may be grounds for remand if it is material; this materiality inquiry requires determining whether the evidence relates to the time period for which the disability benefits were denied. . . ." Id. at 551-552. The Commissioner correctly responds that these additional treatment notes are not relevant because they are for treatment after the ALJ's decision and they do not relate back to the period under review. In addition, the records do not materially change the information that was available to the ALJ.

## **RECOMMENDATION**

Accordingly, IT IS RECOMMENDED that: (1) the cross-motion of the defendant, Carolyn W. Colvin, Acting Commissioner of Social Security Administration ("Commissioner"), for summary judgment (Rec. doc. 20) be GRANTED; and (2) the motion of the plaintiff, Annie D. Sartin, for summary judgment (Rec. doc. 16) be DENIED.

## OBJECTIONS

A party's failure to file written objections to the proposed findings, conclusions and recommendations in a magistrate judge's report and recommendation within fourteen (14) calendar days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  <u>Douglass v. United Servs. Auto. Ass'n</u>., 79 F.3d 1415, 1430 (5th Cir. 1996) (*en banc*).

New Orleans, Louisiana, this 13th day of May, 2016.

**SALLY SHUSHAN**
**U.S. Magistrate Judge**